UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| In re: | ) | |
| MCKENZIE FINANCIAL CENTER, LLC, | ) | Case No. 1:10-cv-339 |
| | ) | Judge Mattice |
| *Debtor.* | ) | |
| | ) | |
| | ) | |
| WESTERN SURETY COMPANY, | ) | |
| | ) | |
| *Appellant,* | ) | |
| | ) | |
| v. | ) | On appeal from: |
| | ) | EDTN Bankruptcy Ct. |
| REGIONS BANK, | ) | Case No. 1:09-ap-1025 |
| | ) | Judge Cook |
| *Appellee*. | ) | |

### MEMORANDUM AND ORDER

Appellant Western Surety Company appeals, pursuant to 28 U.S.C. § 158(a) and Federal Rule of Bankruptcy Procedure 8001(a), the orders of the bankruptcy court entered on November 9, 2010 granting the Motion for Summary Judgment filed by Regions Bank and denying the Motion for Summary Judgment filed by Western Surety Company. [Court Docs. 1-34 & 1-35.]

For the reasons stated below, the Court concludes that the bankruptcy court did not err and its ruling will be **AFFIRMED**.

**I.  STANDARD OF REVIEW**

In an appeal from a bankruptcy court, the Court must uphold the findings of fact made by the bankruptcy court unless such findings are clearly erroneous. *Stamper v. United States (In re Gardner)*, 360 F.3d 551, 557 (6th Cir. 2004); Fed. R. Bankr. P. 8013. The Court reviews *de novo* the bankruptcy court's conclusions of law. *Gardner*, 360 F.3d

at 557; Fed. R. Bankr. P. 8013. The Court has the authority to affirm, modify, or reverse a judgment or order of the bankruptcy court, and also may remand the case to the bankruptcy court for further proceedings. Fed. R. Bankr. P. 8013.

## II.  FACTS AND PROCEDURAL HISTORY

The relevant facts, as set forth by the Bankruptcy Court, are as follows. In May 2005, an entity named McKenzie Financial Center, LLC (hereinafter "the Debtor") contracted with C & I Speciality Co, Inc. (hereinafter "the Contractor") for the construction of an office building in Cleveland, Tennessee. (Court Doc. 1-33, Bankruptcy Memorandum at 2.) The agreed-upon fee for the construction project was $5,232,400, and Western Surety Company (hereinafter "Appellant") issued payment and performance bonds in August 2005 to guarantee the Contractor's obligations. (*Id.*)

The Debtor and Steven A. McKenzie, operating as the Debtor's guarantor, contracted with AmSouth Bank (the predecessor to Regions Bank, hereinafter the "Appellee Bank") in September 2005 to finance the construction of the office building. (*Id.*) The Appellee Bank agreed to lend the Debtor up to $5,285,000 and initially advanced $4,640,000 in exchange for a Promissory Note with a maturity date of March 12, 2007. (*Id.*) The promissory note was secured by a deed of trust to the real estate at issue in the construction project. (*Id.*) The contract between the Debtor and the Appellee Bank contained a provision that required the Debtor to make requests for loan disbursements and required the bank to disburse 90% of the costs of the completed construction after inspecting the progress. (*Id.* at 3.) The additional 10% was termed "retainage." (*Id.*) The financing contract contained several prerequisites before the loan amounts would be

-2-

Case 1:10-cv-00339-HSM-WBC   Document 17   Filed 08/11/11   Page 2 of 18   PageID #: 1881

disbursed. (*Id.*)

After the financing contract was executed, the Contractor began to submit applications for payment to the Debtor, the Debtor made application to Appellee Bank for the funds, and Appellee Bank advanced 90% of the requested funds to the Debtor to be disbursed to the Contractor. (*Id.* at 6-7.) From 2006 through March 9, 2007, the Appellee Bank deposited funds to the Debtor's construction checking account in the total of $4,639,991.00, the total amount of the Promissory Note. (*Id.* at 7.) During this time, the Contractor had financial difficulties and assigned its rights under the construction contract to the Appellant. (*Id.*) In January 2007, the Contractor's license expired. (*Id.*) In early 2007, Mr. McKenzie and his entities, including the Debtor, also began experiencing financial difficulties and, as a result, the loans to the Debtor and Mr. McKenzie's other companies were transferred to the Special Assets Division of the bank. (*Id.*) In March 2007, several loans to these companies, totaling $7.6 million, were placed in default because they had reached maturity without full payment. (*Id.*) The Appellee Bank attempted to work with the Debtor and Mr. McKenzie to extend the time for payment and increase the loan amount, but the defaults were never cured. (*Id.* at 7-8.)

In April 2007, the Contractor submitted an application for a progress payment in the amount of $96,648.45 for 100% of the work contemplated under the construction contract. (*Id.* at 8.) In June 2007, the Appellee Bank increased the loan amount by $622,000 to be able to pay the Contractor in full for the remaining amount due. (*Id.*) The maturity date on the loan was also extended for six months. (*Id.*) When the amendment was executed, the Appellee Bank issued the requested $96,648.45 payment to the Debtor's construction

checking account. (*Id.* at 9.)

As of September 2007, the Debtor was not keeping current on the amounts due under the Promissory Note. (*Id.*) In mid-September, the Appellee Bank amended the contract again to extend the time period for construction financing until December 12, 2007. (*Id.*) In early November, the Appellee Bank received the Debtor's final draw request, and $499,027.64 remained available under the contract to fund the request. (*Id.* at 10.) Shortly thereafter, the construction project inspector appointed by the Appellee Bank recommended the distribution of two final pay requests in the amount of $566,413.02, which was 10% of all payments previously made under the construction contract (the "retainage" funds). (*Id.*) The Appellee Bank, however, told the Debtor that several things had to occur before this amount would be disbursed. (*Id.*) Specifically, the Debtor had to acknowledge that the punch list was complete, had to deposit $71,000 in its construction checking account to cover the amount in excess of the available funds in the line of credit, and had to pay two past due monthly interest charges. (*Id.* at 10-11.) The Debtor did not complete these conditions by December 12, 2007, the loan's maturity date. (*Id.* at 11.) As such, the bank retained the $499,027.64 as an offset against the balance owed by the Debtor, and the funds were never paid to the Contractor. (*Id.*)

Appellant, as the assignee of the Contractor's rights to payment, obtained a judgment against the Debtor in the Chancery Court of Bradley County in the amount of $575,228.02 on December 15, 2008. (*Id.*) On December 20, 2008, the Debtor filed a petition for Chapter 7 bankruptcy, and the Appellant then initiated the instant adversary proceeding against the Appellee Bank. (*Id.*)

-4-

## III. ANALYSIS

Appellant argues on appeal that the bankruptcy court improperly construed the definition of "owner" relevant to the applicable statute and that the grant of summary judgment to Appellee Bank should be reversed. (Court Doc. 3, Appellant Br. at 12.) Appellant contends that, with the creation of Tennessee Code Annotated § 66-11-144, the Tennessee legislature intended to guarantee that contractors received any retained funds when they completed the construction project. (*Id.* at 13.) The wording of the statute applies to owners of construction projects, not necessarily to the lenders, but Appellant claims that lenders become an owner for the purposes of this statute when they acquire a controlling lien interest in the property and retain funds from those disbursed to the contractor. (*Id.*) Appellant argues that Appellee Bank became a functional owner of the construction project in the instant case when it executed the financing contract and required a deed of trust to secure the property because the deed of trust constituted a distinct ownership interest. (*Id.* at 14.) As such, Appellant contends that Appellee Bank violated the terms of the statute by failing to deposit the retainage funds in an escrow account for the Contractor and thus circumvented the statutory protection intended by the Tennessee legislature when it set those funds off against the Debtor's repayment obligations. (*Id.* at 15.)

Appellant finds fault with the bankruptcy court's reliance on the case of *Anco Supply Co. v. Wilkes*, 1986 WL 10149 (Tenn. Ct. App. Sept. 19, 1986) which, Appellant contends, contained a very technical definition of "owner" in dicta. (Appellant Br. at 17.) Appellant argues that the legislature intended a much broader, more functional application of the

word "owner" because it applied to *any* contract, including the contract in the instant case. (*Id.* at 17-18.) Appellant claims that the phrase "which may be sold under process" in the definition of "owner" only applies to owners of public lands and does not apply to Appellee Bank, which fits other parts of the definition, namely, "a person having any right, title or interest, legal or equitable, in real property." (*Id.* at 19.) According to Appellant, Appellee Bank's position as the holder of the Construction Mortgage Deed of Trust on privately-owned land meets the requirement of an equitable interest in real property to make Appellee Bank the "owner" of the property at issue in the construction financing contract. (*Id.*) Moreover, Appellant argues that Appellee Bank functioned as an owner by virtue of the retainage it required as part of the contract, and this behavior invoked the application of the statute. (*Id.* at 19-20.) Appellant acknowledges Appellee Bank's argument with regard to the subsequent amendments to the statute excluding banks, but contends that Appellee Bank did not accurately quote the precise exclusion, which only applies to portions of the Prompt Pay Act enacted in 1991 – amendments that did not affect the subject statute. (*Id.* at 20-21.) As such, Appellant claims that the legislature never intended to exclude banks from the statute governing retained funds for contractors. (*Id.* at 21.)

Appellee Bank frames the issue on appeal somewhat differently, claiming that the only issue is whether the bankruptcy court properly held that the Debtor's defaults relieved Appellee Bank from its obligation to make a final disbursement to the Debtor, Contractor or Appellant. (Court Doc. 7, Appellee Br. at 1.) Appellee argues that the bankruptcy court did not base its holding on the application of Tennessee Code Annotated § 66-11-144 and

-6-

this Court need not focus on Appellant's argument in that regard. (*Id.* at 8.) Nonetheless, Appellee Bank offers its arguments against the contentions made by Appellant, claiming that the financing contract between Appellee Bank and Debtor does not fit within the parameters of the statute because it is not a "contract for the improvement of real property" and the application of the statute under these circumstances would go against the legislative intent. (*Id.* at 9.)

Appellee Bank represents that the bankruptcy court found that it had no obligation to disburse funds to the Debtor under the financing contract and, as such, no breach of contract claim existed. (*Id.*) Appellee claims that this appeal is based on dicta in Judge Cook's opinion and the Court need not review this issue because it is collateral to the decision of the bankruptcy court and the argument upon which it was based was abandoned by Appellant. (*Id.* at 9-10.) Appellee argues that Appellant asserted and then withdrew its claim based on Tenn. Code Ann. § 66-11-144 earlier in various stages of pleadings and made this withdrawal clear during a hearing on discovery matters. (*Id.* at 10-11.) Appellee essentially urges the Court to confine its focus to the following issues – the holding by the bankruptcy court that Appellee Bank was not required to disburse the retainage funds to the Debtor due to breach, and the factual findings that the Debtor failed to comply with the conditions required prior to the final disbursement and that the Debtor failed to repay the construction loan when it matured. (*Id.* at 13-14.) Appellee contends that anything beyond these factual findings and conclusion need not be reviewed by this Court because the application of the statute did not form the basis for the bankruptcy court's decision. (*Id.* at 14-15.)

-7-

Appellee Bank next argues against the application of Tenn. Code Ann. § 66-11-144, asserting that it is a lien holder, not an owner as contemplated by the statute; in addition, Appellee argues that the financing contract is not a "contract for the improvement of real property" as contemplated by the statute. (*Id.* at 15-18.) Appellee Bank further asserts that application of the statute under circumstances such as these would be inappropriate because the statute was created for construction contracts, not financing contracts, and financing contracts are addressed in other parts of the Tennessee Code. (*Id.* at 19.) Finally, Appellee Bank argues that Tennessee does not impose trust or fiduciary obligations on banks unless such obligations are expressly included in a contract. (*Id.* at 21.) Appellee represents that a bank generally has no duty to distribute loan funds for the benefit of a borrower or third party as outlined in case law and statute and, in order for Appellee Bank to be required to disburse the funds at issue, it must have specifically assumed the trust or fiduciary obligation for the benefit of Appellant. (*Id.*)

The Court has carefully reviewed Judge Cook's memorandum denying Appellant's motion for summary judgment and granting Appellee's motion. During the bankruptcy court proceedings, the Appellant amended its Complaint multiple times and eventually argued that it was the assignee of a third party beneficiary, the Contractor, to the financing contract between the Debtor and Appellee Bank, and that the Appellee Bank breached the contract by failing to pay the retainage. (Bankr. Mem. at 11.) Judge Cook noted in the memorandum that there were three issues raised on summary judgment – first, whether Appellant was a third party beneficiary; second, assuming that Appellant was a third party beneficiary, whether a breach of contract occurred; and third, if Appellant was a third party beneficiary *and* if a breach of contract occurred, whether Appellee Bank's affirmative

-8-

Case 1:10-cv-00339-HSM-WBC   Document 17   Filed 08/11/11   Page 8 of 18   PageID #: 1887

defense with respect to the expired contractor's license barred Appellant's recovery. (*Id.* at 12.) Judge Cook concluded, however, that he needed only to decide the second issue as to breach of contract because Appellant's claims would fail under any theory. (*Id.* at 13.) After pointing to undisputed facts in the record that demonstrated Debtor's defaults, Judge Cook wrote:

> Recognizing that the debtor had not satisfied all conditions that were necessary before the bank was contractually obligated to find the "final draw request," and before the loan maturity date, [Appellant's] attorney made a new argument during the hearing on the motions. Counsel reiterated an argument presented in his brief that Section 8.19 of the construction financing contract, which grants the bank setoff rights in loan funds and deposits, should not be construed to apply to retainage funds, and he offered a new, alternative argument that Section 8.19 should be stricken from the contract on public policy grounds.

(*Id.* at 15.) Section 8.19 of the financing contract stated as follows:

> <u>Liens: Setoff by Bank.</u> Borrower hereby grants to the Bank a continuing lien, as security for the Note and all other indebtedness of the Borrower to the Bank, upon any and all of its moneys, securities and other property and the proceeds thereof, now or hereafter held or received by or in transit to, the Bank from or for the Borrower, and also upon any and all deposits (general or special, matured or unmatured, including, but not limited to, the construction checking account with the Bank for this loan) and credits of the Borrower against the Bank, at any time existing. **Upon the occurrence of any Event of Default as specified above, the Bank is hereby authorized at any time and from time to time, without notice to Borrower, to set off, appropriate, and apply any and all liens hereinabove referred to against any or all indebtedness of the Borrower to the Bank.**

(Court Doc. 1-7, Financing Contract at 23-24 (emphasis added).) Included in the list of Events of Default were failure of the borrower to pay principal or interest on the loan; failure to pay the loan when it matured; and failure of borrower to pay any indebtedness due to

the bank or default under any other indebtedness due to the bank. (*Id.* at 16-19.) The undisputed facts before the bankruptcy court showed that the Debtor had defaulted on the construction loan and had failed to cure this default, in addition to failing to cure defaults on other loans with Appellee Bank. (Bankr. Mem. at 15.)

As stated in Judge Cook's memorandum, at the hearing on the cross-motions for summary judgment in bankruptcy court, Appellant made a new argument with regard to Section 8.19. (Bankr. Mem. at 15.) Appellant argued that the section did not apply to retainage funds and argued in the alternative that it should be stricken from the contract on public policy grounds. (*Id.*) The bankruptcy court initially determined that nothing in Section 8.19 exempted undisbursed retainage funds and that the Appellant wanted to treat the funds as if they were actually disbursed. (*Id.*) The facts of the case, however, did not support that interpretation because the retainage funds were never released or disbursed by the Appellee Bank. (*Id.* at 15-16.) Therefore, the funds remained "credits of the Borrower against the Bank" and fell within those contemplated by Section 8.19. (*Id.* at 16.) As for the public policy argument, Judge Cook noted that Appellant essentially argued that public policy should invalidate all contractual defenses (including Section 8.19) and that the bank was obligated to disburse the funds regardless of defaults. (*Id.* at 16.) In support of this argument, Appellant pointed to Tennessee Code Annotated § 66-11-144, which requires retainage funds to be held in an escrow account. (*Id.*) Judge Cook discussed the statute briefly in the context of Appellant's public policy argument before he determined that the bank was not an "owner" per the statute and dismissed the claim. (*Id.* at 16-17.)

The bankruptcy court concluded that the bank was not subject to the statutory

provision and that no public policy would support striking contractual provisions between the Debtor and Appellee Bank because Appellee Bank properly offset the retainage funds against the Debtor's obligation to repay the loan. (*Id.* at 17-18.) The bankruptcy court finally noted that the Appellant stepped into the shoes of the Debtor and had no more rights than the Debtor. (*Id.*) Judge Cook's conclusion at the end of the memorandum reads as follows:

> In sum, the court concludes that the plaintiff cannot recover because the debtor's non-performance under the financing contract precludes the plaintiff from forcing the bank to disburse more funds, and the bank was within its rights to offset the debtor's remaining line of credit against the debtor's obligation to repay the bank upon maturity of the financing loan. Public policy does not require the court to alter the contractual terms agreed to by the parties.

(*Id.* at 18.)

It appears to the Court that Judge Cook's decision was primarily based on the clear and unambiguous terms of the financing contract, but he did briefly address Appellant's public policy argument with regard to Section 8.19 that was newly raised at the motion hearing. It also appears to the Court that Appellant has taken the opportunity to flesh out this argument on appeal, at least with respect to the narrow issue of whether Appellee Bank qualifies as an "owner" under the applicable statute.

The Court agrees with Judge Cook's findings and conclusions with respect to the terms of the contract. The retainage funds were never released by the bank and thus remained within the scope of Section 8.19 as funds that could be applied against the debt in the event that the Debtor defaulted on the financing agreement. The Court also notes that the undisputed facts before the bankruptcy court established that Debtor defaulted on

-11-

the financing contract. Therefore, as to the terms of the contract, the Court agrees that Appellee Bank was within its rights to apply the retainage funds to offset the Debtor's outstanding loan obligation.

Essentially, therefore, Appellant seeks to appeal Judge Cook's determination that public policy does not mandate striking Section 8.19 from the contract. To do so, Appellant argues that Appellee Bank is an "owner" for the purposes of Tennessee Code Annotated § 66-11-144 and had to comply with the requirements of that statute, and that noncompliance with the statute is against public policy. The statute in effect during the applicable time period, in relevant part, reads as follows:

> (a) Whenever, in any contract for the improvement of real property, a certain amount or percentage of the contract price is held back by the owner or contractor, that retained amount shall be deposited in a separate escrow account with a third party giving proper security for the performance of the obligation of the owner or contractor.
>
> (b) As of the time of the deposit of the retained funds, such funds shall become the sole and separate property of the contractor, subcontractor, materialman, or laborer to whom they are owed.
>
> (c) Upon satisfactory completion of the contract, to be evidenced by a written release by the owner or contractor, all funds accumulated in the escrow account together with any interest thereon shall be paid immediately to the contractor, subcontractor, materialman or laborer to whom such funds and interest are owed.
>
> (d) In the event the owner or contractor fails or refuses to execute the release provided for in subsection (c), then the contractor, subcontractor, materialman, or laborer, shall seek any remedy in a court of proper jurisdiction and the person holding the fund as escrow agent shall bear no liability for the nonpayment thereof to the

-12-

Case 1:10-cv-00339-HSM-WBC   Document 17   Filed 08/11/11   Page 12 of 18   PageID #: 1891

> contractor, subcontractor, materialman, or laborer.
>
> . . .
>
> (g) The provisions of this section shall be applicable to all contracts for the improvement of real property when the contract price is five hundred thousand dollars ($500,000) or greater.
>
> (h) Compliance with this section shall be mandatory, and may not be waived by contract.

Tenn. Code Ann. § 66-11-144 (now § 66-34-104). The definition of owner in this section states that "'[o]wner' includes the owner in fee of real property, or of a less estate herein, a lessee for a term of years, a vendee in possession under a contract for the purchase of real property, and any person having any right, title or interest, legal or equitable, in real property, which may be sold under process." Tenn. Code Ann. § 66-11-101(11).

As a preliminary matter, although this was not squarely at issue in the bankruptcy court proceeding, the Court is inclined to agree with Appellee Bank's first argument that the contract at issue in this case - between the Debtor and Appellee Bank - was not a contract "for the improvement of real property" as contemplated by the statute. Appellant puts heavy emphasis on the word "any," but it would seem to the Court that the proper emphasis should be on the word *for*. The financing contract between Debtor and Appellee Bank could be characterized as *facilitating* the improvement of real property, *relating to* the improvement of real property, or *financing* the improvement of real property, but it was not a contract created *for* the improvement of real property. The contract at issue, in and of itself, had nothing to do with the construction or improvement of real property, and focused solely on the transfer of funds from Appellee Bank to Debtor. Debtor used those funds to enter into a contract with the Contractor, and the contract between Debtor and Contractor

-13-

was the kind of contract contemplated by the statute because it was explicitly *for* the improvement of real property, i.e., Contractor was contracting to provide construction services to improve the property, and Debtor was contracting to pay for those services.

The Court will draw a simple analogy. When an individual procures a car loan from a bank, the loan agreement may state that the funds are being advanced *for* the purchase of a vehicle, but the contract between the individual and the bank is not a contract for the purchase of the vehicle; the bank is advancing funds to the individual so the individual can enter into a contract with another entity (a car dealership, another individual) to purchase the vehicle. As the Court has stated, this contract would *facilitate*, *relate to*, or *finance* the purchase of the vehicle, but it is not, at least in the Court's view, *for* the purchase of the vehicle. Nonetheless, because Judge Cook made no factual finding or legal conclusion with respect to this portion of the statute, the Court does not end its analysis on this issue.

As to Appellant's primary argument with respect to the bank as an "owner," the Court has extensively searched Tennessee case law for a clarification of "owner" and the phrase "which may be sold under process" and could find little else beyond the case upon which Appellee Bank and Judge Cook relied - *Anco Supply Co. v. Wilkes*, 1986 WL 10149 (Tenn. Ct. App. Sept. 19, 1986). In *Anco*, the Tennessee Court of Appeals was interpreting the very definition reproduced above and concurred with the statement that "the mortgagee is not an owner but only a creditor holding a lien" for the purposes of a statute requiring notice of mechanic's liens. *Id.* at *2-3. In contrast, a mortgagor holding title to mortgaged property, even if a trustee held the legal title, would be considered the owner for purposes of the statute. *Id.* at *2. In his memorandum, Judge Cook determined

-14-

that this case lent support for the proposition that the bank did not have a real property interest "which may be sold under process." The Court finds that Appellant has not advanced a very compelling argument that the phrase "which may be sold under process" is not relevant such that the bank's unqualified "right, title or interest, legal or equitable, in real property" would make it an owner. Therefore, although Appellant argues against the application of the *Anco* case, the Court finds no fault with Judge Cook's reliance thereon.

The Court has no quarrel with Appellant's recitation of the legislative history with respect to the protection of contractors who perform construction work and need to be paid; certainly, the statute was intended to ensure that contractors and subcontractors received money upon completion of work performed under a contract. The Court agrees, however, with Appellee Bank's argument that the party who was required to comply with this statute was the *Debtor*, not the bank. The Debtor was the owner of the real property at issue and entered into a contract with the Contractor for the improvement of real property. The Debtor, therefore, falls squarely within the scope of the "owner" contemplated by Tenn. Code Ann. § 66-11-144(a) and was thus certainly required to maintain a retainage account pursuant to the statute. The Court can perceive of a way in which the statute might require multiple parties to maintain retainage accounts, but the Court cannot perceive of a logical reason for which both the property owner and the lending bank with a security interest would be required to maintain dual retainage accounts for the benefit of the contractors. Appellee Bank's choice to structure a retainage account appears to have been for its own purposes, to protect itself against possible default of the Debtor. There was nothing impeding the Debtor from structuring a retainage account as well to comply with the statute. Indeed, it appears that such an account was required of

-15-

the Debtor and that Appellant's attempt to procure this money should be directed towards the Debtor, not Appellee Bank.

Finally, the Court takes note of Judge Cook's finding that his "interpretation of the statute is confirmed by subsequent changes in Tennessee law, which moved these retainage requirements to a chapter that expressly exempts banks from its scope." (Bankr. Mem. at 17.) Section 66-11-144 was moved to § 66-34-104 in 2008, and the last statute in that chapter, Tennessee Code Annotated § 66-34-703, reads that "[t]he provisions of this chapter, the "Prompt Pay Act of 1991," as enacted by Acts 1991, chapter 45, do not apply to any bank, savings bank, savings and loan association, industrial loan and thrift company, other regulated financial institution or insurance company." Although Appellant now argues that this does not exclude banks from being owners in the old statute, § 66-11-144, because that statute was not enacted by Acts 1991, chapter 45, this Court has previously held that the broad exclusion in § 66-34-703 applies to all provisions of the chapter. *See AMC Demolition Specialists, Inc. v. Bechtel Jacobs Co., LLC*, No. 3:04-CV-466, 2006 WL 2792401 (E.D. Tenn. Sept. 26, 2006). Although *AMC* was decided before the applicable statute was transferred to the Prompt Pay Act and addressed the statute in the context of other provisions of the Prompt Pay Act, the Court's analysis of this provision is still relevant. Noting the absence of guidance from the Tennessee courts, the Court acknowledged Tennessee statutory interpretation rules and stated as follows:

> Section 66-34-703 provides that the provisions of the Prompt Pay Act "do not apply to any bank...." The words chosen by the Legislature are admittedly broad, but the Court cannot say that the scope of this language renders its meaning unclear or ambiguous. To the contrary, the Court finds the statute to be quite clear: the plain language of this statute prohibits the application of the Prompt Pay Act to any bank, and it therefore

-16-

> follows that any rights afforded to contractors under the Act cannot affect the rights of a bank or other financial institution. Had the Legislature wanted to limit the protection afforded to banks under this provision, it certainly could have done so. Instead, however, by using this broad, all-inclusive language, it appears to the Court that the Legislature chose to remove banks entirely from the purview of the Act.

*Id.* at *17-18. If the Tennessee Legislature did not intend to exclude banks from the scope of § 66-11-144, surely it would not have transferred it into a chapter that was entirely subject to this broad, exclusionary provision.

Accordingly, the Court agrees with the bankruptcy court's conclusion that the bank was not an "owner" for purposes of Tenn. Code Ann. § 66-11-144(a) and that the public policy advanced by that statute did not mandate the striking of any contract provisions in the financing contract between the Debtor and Appellee Bank. As such, Appellee Bank was not required to maintain a retainage account for the benefit of the contractor, was within its contractual rights to apply those funds as a setoff to the amount of the loan default, and was not required to disburse its retainage funds to Appellant.[1]

## IV.  CONCLUSION

Having reviewed the bankruptcy court's factual findings for clear error and legal conclusions *de novo*, the Court finds no error. Accordingly, the bankruptcy court's November 9, 2010 Order [Court Doc. 1-34] denying Western Surety Company's Motion for Summary Judgment and Order [Court Doc. 1-35] granting Regions Bank's Motion for Summary Judgment are **AFFIRMED**.

---

[1] The Court notes that even if it had decided otherwise, Appellee Bank had other defenses which the bankruptcy court did not find necessary to reach that might have dictated the same outcome.

A separate judgment will enter.

**SO ORDERED** this 11th day of August, 2011.

                                           */s/Harry S. Mattice, Jr.*
                                           HARRY S. MATTICE, JR.
                                     UNITED STATES DISTRICT JUDGE